**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNENVIRONMENT, INC. and THREE RIVERS WATERKEEPER, | ) ) ) |
| Plaintiffs, | ) ) ) |
| PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, | ) ) ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| BVPV STYRENICS LLC and STYROPEK USA, INC., | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.
2:23-cv-02067-NR

**[PROPOSED] CONSENT DECREE AND ORDER**

Upon consideration of the Motion for Entry of Consent Decree and Order filed by the Parties, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.    BACKGROUND

1.    On December 5, 2023, PennEnvironment, Inc., and Three Rivers Waterkeeper (collectively, "Plaintiffs"), filed a Complaint in this action against BVPV Styrenics LLC and Styropek USA, Inc. (collectively, "Defendants" or "Styropek") under the federal Clean Water Act, 33 U.S.C. § 1251, *et seq.* ("CWA"), for alleged violations of the CWA at Defendants' expandable polystyrene manufacturing facility at 400 Frankfort Road, Monaca, PA ("the Facility"), which case was docketed at Civil Action No. 2:23-cv-02067-NR.

2.    On August 19, 2025, the Commonwealth of Pennsylvania, Department of Environmental Protection ("Department") filed a Petition to Intervene in this matter.

PennEnvironment, Inc., Three Rivers Waterkeeper, the Department, and Styropek may be collectively referred to as "the Parties."

3.      The Parties attest and the Court, by entering this Consent Decree and Order (the "Consent Decree"), finds that this Consent Decree has been negotiated by all the Parties in good faith; settlement will avoid continued litigation between the Parties; settlement of this matter is in the public interest and in accordance with the CWA; and entry of this Consent Decree is fair and reasonable.

4.      On the date this Consent Decree is filed with the Court, Plaintiffs shall concurrently serve a copy of this Consent Decree on the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region III, and the United States Department of Justice, consistent with the requirements of 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.5.

## II.    JURISDICTION AND VENUE

5.      For purposes of this Consent Decree, Defendants agree that the Complaint states a claim upon which relief may be granted pursuant to 33 U.S.C. § 1365.  This Court has jurisdiction over the Parties and subject matter of this Consent Decree pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 1365.  Venue is proper in this Court pursuant to 33 U.S.C. § 1365(c) and 28 U.S.C. §§ 1391(b) and (c).

## III.   APPLICABILITY

6.      The provisions of this Consent Decree shall apply to and be binding upon the Parties and their respective officers, employees, successors, and assigns.

7.      The duties and obligations under this Consent Decree shall not be modified, diminished, terminated or otherwise altered by the sale or transfer of any legal or equitable interest in the Facility or any part thereof.

8.      <u>Transfer of Site</u>:  If, during the pendency of this Consent Decree, the Defendants (or any one of them) seek to transfer any legal or equitable interest in the Facility, Defendants shall serve a copy of this Consent Decree upon the transferee at least thirty (30) days prior to the contemplated transfer of operations and shall contemporaneously inform the Department and Plaintiffs.  In the event of any transfer, in whole or in part, of ownership of, operation of, or other interest (exclusive of any non-controlling, non-operational shareholder interest) in the Facility, Defendants shall ensure that each of the obligations of this Consent Decree are made applicable to either the transferee or are retained by Defendants. Styropek shall petition the Court to modify the Consent Decree to substitute the transferee for Defendants (or any one of them) as a Party hereto, or add the transferee as a Party hereto, as appropriate and consistent with the terms of the transfer.

## IV.    DEFINITIONS

9.      For the purposes of this Consent Decree, the following terms shall have the following meanings:

a.      "<u>Certification</u>" means the relevant document is to be accompanied by a signed statement from a responsible official from the party submitting the document attesting that, based on information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate, and complete.

b.      "Days" means calendar days, including weekends and holidays. Computation of time begins the day after receipt by the representative designated in Paragraph 46 (Notices).

c.      "Outfall 002" means the industrial process wastewater discharge point described in Part A, Section I.B of the Permit.

d.      "The Permit" means NPDES Permit No. PA0006254 (Amendment No. 2), issued by the Department on September 29, 2020, to BVPV Styrenics LLC, pursuant to the National Pollutant Discharge Elimination System ("NPDES") permitting program of the CWA, 33 U.S.C. § 1342, and including any and all subsequent amendments, modifications, renewals or reissuances thereof.   NPDES Permit No. PA0006254 was first issued on July 16, 2019, to Nova Chemicals, Inc.

e.      "Plastic Solid(s)," solely for purposes of determining compliance with this Consent Decree, means a plastic pellet, bead, or cutting utilized or produced at the Facility visible to the naked eye without special equipment and 50 microns or greater in size.

f.      "Rain Event" means a period of rainfall measuring more than 0.25" at the Facility within a 24-hour period.

g.      "Stormwater Outfalls" means the permitted outfalls at the Facility from which stormwater runoff is currently discharged (designated as Outfalls 001, 020, 021, and 025 in the current version of Part A of the Permit), or from which stormwater runoff is discharged under any reconfiguration of stormwater controls at the Facility undertaken during the life of this Consent Decree. In addition to stormwater runoff, Outfall 001 also is authorized to discharge non-contact cooling water and excess river intake water under Part A of the Permit.

h.    "<u>Unauthorized Discharge</u>," solely for purposes of determining compliance with this Consent Decree, means the addition of Plastic Solid(s) from Outfall 002 or any of the Stormwater Outfalls at the Facility to Raccoon Creek or the Ohio River.   In the event that any less stringent effluent limitation or standard applicable to Plastic Solids is established by any Pennsylvania state or federal government entity, such effluent limitation or standard shall automatically modify the definition of Unauthorized Discharge and become applicable to this Consent Decree.

## V.    COMPLIANCE AND PERFORMANCE OBLIGATIONS

10.    Styropek shall review the current design and operation of the Facility with regard to the Unauthorized Discharge of Plastic Solids, and shall design, implement, and monitor the effectiveness of measures to halt Unauthorized Discharges, pursuant to Paragraphs 11 – 25, below.

COMPLIANCE MEASURES FOR
<u>PROCESS WASTEWATER AND OUTFALL 002</u>

11.    Styropek shall implement compliance measures for management of process wastewater and discharges from Outfall 002 at the Facility as described in Paragraphs 12 – 15, below.

a.    <u>Production Stoppage</u>: If, during the pendency of this Consent Decree, Styropek intends to completely stop the production and discharge of industrial process wastewater through Outfall 002 by stopping all manufacturing operations at the Facility that generate industrial process wastewater, it shall notify the Department and Plaintiffs at least thirty (30) days prior to the contemplated production stoppage date.   The deadlines for all uncompleted compliance measures set forth in Paragraphs 12 – 15, below, shall be tolled upon receipt by the Department and Plaintiffs of written certification from Styropek that the production and discharge of

industrial process wastewater through Outfall 002 has stopped.  Such deadlines shall remain

tolled until: (i) the date Styropek or a successor owner or operator resumes manufacturing

operations that generate process wastewater with the potential for containing Plastic Solids, in

which case it shall notify the Department and Plaintiffs at least thirty (30) days prior to the

resumption of manufacturing operations; or (ii) Styropek satisfies all other requirements for

termination of the Consent Decree set forth in Paragraph 59, at which time the tolled compliance

measures will be deemed completed.

   12. <u>Initial Compliance Measures (Process Wastewater)</u>:

    a. **Turbidity Curtain Upgrades**.  On or before April 22, 2024, Styropek

installed new turbidity curtains at the Facility's wastewater lagoons.  Not later than thirty days

after the effective date of this Consent Decree, Styropek shall provide Plaintiffs and the

Department with a written report that includes the following: (i) certification that it has replaced

the turbidity curtain near the Outfall 002 V-notch weir and properly determined its sizing,

placement, and installation to maximize effectiveness of Plastic Solids capture; (ii) certification

that it has installed and similarly  determined the sizing, placement, and installation of an

additional turbidity curtain at the transition between the aeration and quiescent lagoons; (iii) the

dates by which each of the preceding measures were completed; and (iv) a description of the

practices it has developed to ensure that the turbidity curtains are maintained in proper condition

so that they will individually and collectively perform the function for which they were designed,

and certification that it will continue to follow those practices.

    b. **Ferric Sulfate Coagulant**.  On or before August 26, 2024, Styropek

installed equipment necessary to perform a full-scale trial of the addition of ferric sulfate

coagulant to the Facility mix pit following the Department's approval of the use of ferric sulfate

on April 2, 2024.  Not later than thirty days after the effective date of this Consent Decree, Styropek shall provide Plaintiffs and the Department with a written report that includes: (i) certification that full scale implementation of the ferric sulfate coagulant is complete; (ii) a description of ferric sulfate use (e.g., dosing rates and location); and (iii) a description of the practices it has developed for operation of the coagulant system, and certification that it will continue to follow those practices while needed during Styropek's manufacturing operations.

    c. **Cloth Media Filter (Outfall 002)**.  On or before June 30, 2024, Styropek installed an AquaDisk Filter with a 10-micron filter media ("Cloth Media Filter") at Outfall 002 to treat wastewater prior to discharge.  Styropek subsequently completed a trial of the equipment. Not later than six months after the effective date of this Consent Decree, Styropek shall provide Plaintiffs and the Department with a written report that includes the following:  (i) certification that installation and the trial of the Cloth Media Filter have been completed, including the completion date(s); (ii) monitoring data collected during the Cloth Media Filter trial; (iii) a description of the inspection, maintenance, and training programs developed for the Cloth Media Filter, and copies of associated instruction materials; (iv) a description of the practices it has developed to ensure that the Cloth Media Filter is maintained in proper condition to perform the function for which it was designed, and certification that it will continue to follow those practices; (v) a determination of whether the Cloth Media Filter will be permanently installed; (vi) a schedule for submitting a Part II Permit application if the Cloth Media Filter will be permanently installed, and (vii) a determination, with supporting analysis, as to whether the operation of the Cloth Media Filter – in conjunction with the Initial Compliance Measures set forth in Paragraph 12 and any other measures implemented by Styropek – is sufficient to achieve and maintain a condition of no Unauthorized Discharges from Outfall 002.

13.    <u>Industrial Process Wastewater Engineering Alternatives Report</u>.  Not later than six months after the effective date of this Consent Decree, Styropek shall provide Plaintiffs and the Department with an Industrial Process Wastewater Engineering Alternatives Report to ensure the availability of alternative mechanisms for prevention of Unauthorized Discharges from Outfall 002 in the event the Cloth Disk Filter proves ineffective.  The Process Wastewater Engineering Alternatives Report shall evaluate alternative end of pipe treatment technology (such as an alternative Cloth Disk Filter system or sand filtration), technologies to improve the current configuration of wastewater treatment at the Facility (such as upfront equalization and enhanced sump solids controls), and modifications or replacement of certain treatment units (such as the clarifier or belt filter press).  The Process Wastewater Engineering Alternatives Report shall also include a survey of end of pipe treatment technologies utilized at other plastic production facilities nationwide, and analyze the applicability of those technologies to the Facility.

14.    <u>Final Industrial Process Wastewater Plan</u>.  If Styropek is unable to certify pursuant to Paragraph 12(c)(vii) that the Cloth Media Filter is sufficient to achieve and maintain a condition of no Unauthorized Discharges from Outfall 002, Styropek shall, consistent with good engineering principles and based upon the findings of the Industrial Process Wastewater Engineering Alternatives Report, produce and implement a plan to prevent Unauthorized Discharges from Outfall 002.

a.    **Trials**: Not later than ten months after the effective date of this Consent Decree, Styropek shall have completed any trials of alternatives, including bench scale trials and pilot testing as appropriate.

b.    **Final Industrial Process Wastewater Plan**:  Not later than fourteen months after the effective date of this Consent Decree, Styropek shall submit a full and complete plan and schedule with interim and final deadlines ("Wastewater Plan") to achieve and maintain a condition of no Unauthorized Discharges from Outfall 002 to the Department for its approval. The Wastewater Plan shall include an application to modify the Permit to allow the installation of a treated wastewater sampling mechanism at Outfall 002, pursuant to Paragraph 22.  A copy of the Wastewater Plan shall be provided to Plaintiffs.  Plaintiffs shall have thirty days to review the Wastewater Plan and request additional information.  Following the thirty-day review period, Plaintiffs shall submit comments on the Wastewater Plan to the Department.  The Department shall confer with the parties, and the Department shall approve or disapprove and request modification of the Wastewater Plan.  If the Wastewater Plan is disapproved, Styropek shall submit for the Department's approval a revised Wastewater Plan fully addressing the Department's comments set forth in its disapproval. Upon the Department's approval of the Wastewater Plan, Styropek shall implement the Wastewater Plan.

c.    **Implementation**:  Not later than eighteen months after the Department's approval, Styropek shall complete and fully implement all elements of the Wastewater Plan.

d.    Until its completion, Styropek shall provide Plaintiffs and the Department with quarterly written updates regarding its progress in implementing the Wastewater Plan.

15.    Industrial Process Wastewater Compliance Deadline.

a.    If Styropek determines pursuant to Paragraph 12(c)(vii) that the Cloth Media Filter is sufficient to achieve compliance, Styropek shall achieve and maintain a condition of no Unauthorized Discharges from Outfall 002 beginning not later than six months from the effective date of this Consent Decree.  If Styropek determines pursuant to Paragraph 12(c)(vii)

that the Cloth Media filter is not sufficient, Styropek shall achieve and maintain a condition of no Unauthorized Discharges from Outfall 002 beginning not later than two years from the effective date of this Consent Decree.

b.      In the event that Styropek triggers the tolling provision in Paragraph 11(a) by stopping the production and discharge of industrial process wastewater through Outfall 002, Outfall 002 shall be considered a Stormwater Outfall, and Styropek's obligations as to Outfall 002 will be governed under the deadlines pertaining to stormwater management as set forth in Paragraphs 17(d), 18(c) and (d), and 19, instead of the provisions of Paragraphs 13, 14 and 15(a). In addition, stipulated payments for Outfall 002 will be assessed in accordance with the provisions in Paragraphs 33 and 34 applicable to Stormwater Outfalls.

## COMPLIANCE MEASURES FOR STORMWATER AND STORMWATER OUTFALLS

16.    Styropek shall implement compliance measures for stormwater management and discharges from Stormwater Outfalls at the Facility as described in Paragraphs 17 – 22, below.

17.    Initial Compliance Measures:

a.      **Catch Basin and Manhole Filters**:  Beginning December 2022 to October 10, 2024, Styropek added filters to known stormwater catch basins at the Facility.  Not later than sixty days after the effective date of this Consent Decree, Styropek shall provide Plaintiffs and the Department with a written report on the use of filters on known stormwater catch basins at the Facility that includes:  (i) certification that filters have been added to all known stormwater catch basins; (ii) identification of any manhole cover filters and silt fences placed since December 2022; and (iii) a description of the practices it has developed to ensure that such filters and silt fences are maintained in proper condition to perform the function for which they were designed, and a certification that it will continue to follow those practices.

b.      **CDS Filtration Units (Outfalls 021 and 025)**:  On or before July 11, 2024, Styropek installed a Contech Engineered Solutions, LLC CDS (continuous deflective separation technology) separation unit ("CDS Unit") at Outfalls 021 and 025. Styropek shall complete a trial of the CDS Unit.  The trial period shall last at least six months and shall terminate once ten (10) rain events resulting in a discharge are recorded at each outfall.  Not later than thirty days after the completion of the trial of the equipment, Styropek shall provide Plaintiffs and the Department with a written report that includes: (i) a certification that each CDS Unit was installed, subjected to a trial period, and is currently in operation, and the dates by which such measures were completed; (ii) monitoring reports and monitoring data collected during the CDS Unit trials; (iii) a description of the inspection, maintenance, and training programs developed for the CDS Units, and copies of associated instruction materials; (iv) a description of the practices it has developed to ensure that the CDS Units are maintained in proper condition to perform the function for which they were designed, and a certification that it will continue to follow those practices; (v) a determination of whether the CDS Unit will be permanently installed; and  (vi) a schedule for applying for a Part II Permit if the CDS Unit is being permanently installed.

c.      **Determination of Compliance at Outfalls 021 and 025**: Not later than one year after the effective date of this Consent Decree, Styropek shall determine, and shall report in writing to Plaintiffs and the Department the basis for its determination, whether its existing compliance measures are sufficient to achieve and maintain a condition of no Unauthorized Discharges from Outfalls 021 and 025.  If Styropek is unable to certify that existing compliance measures are sufficient, it shall include in the Stormwater Management Plan required pursuant to Paragraph 18 plans to modify, reconstruct, reconfigure, and/or combine

Stormwater Outfalls and stormwater flows to achieve and maintain a condition of no

Unauthorized Discharges at Outfalls 021 and 025.

       d.     **Determination of Compliance at Outfall 001**:  Not later than one year

after the effective date of this Consent Decree, Styropek shall determine, and shall report in

writing to Plaintiffs and the Department the basis for its determination, whether its existing

compliance measures are sufficient to achieve and maintain a condition of no Unauthorized

Discharges from Outfall 001.  If Styropek is unable to certify that existing compliance measures

are sufficient, it shall include in the Stormwater Management Plan required pursuant to

Paragraph 18 plans to achieve and maintain a condition of no Unauthorized Discharges at Outfall

001.

       18.    <u>Stormwater Management Plan</u>: Styropek shall, consistent with good engineering

principles and considering the findings of the Stormwater System Status Report and all other

available information, produce and submit to the Department, with a copy to Plaintiffs, a plan

and schedule to achieve and maintain a condition of no Unauthorized Discharges from the

Stormwater Outfalls at the Facility ("Stormwater Management Plan").

       a.     **Stormwater System Status Report**: Within ten months of the effective

date of this Consent Decree, Styropek shall complete its investigation and mapping of the

Facility's stormwater system and shall provide Plaintiffs and the Department with a written

Stormwater System Status Report that includes: (i) the layout and condition of the Facility's

stormwater system, including all stormwater lines that may convey wastewater and/or

stormwater to any Outfall, the location of capped or sealed lines, and the drainage areas and

approximate flows to each existing stormwater outfall; (ii) a summary of efforts to remove

obstructions from lines associated with each Stormwater Outfall, including results of dye tests; and (iii) televising results of storm lines.

      b.    **Mandatory Considerations in Plan:**  In drafting the Stormwater Management Plan, Styropek shall consider and provide a feasibility analysis and cost estimates for the following measures:

          i.    installation of a Cloth Media Filter at Stormwater Outfalls 021 and 025;

          ii.    elimination of Outfall 020 by directing to another outfall(s) all stormwater runoff flow currently discharged through Outfall 020; and

          iii.    directing some or all stormwater runoff flows to a repurposed aeration lagoon or quiescent lagoon for treatment and discharge through Outfall 002; and

          iv.    any other alternative measures to achieve a condition of no Unauthorized Discharges from the Stormwater Outfalls at the Facility.

      c.    **Stormwater Management Plan:**  Not later than eighteen months after the effective date of this Consent Decree, Styropek shall provide Plaintiffs and the Department with the written Stormwater Management Plan and schedule with interim and final deadlines to eliminate Unauthorized Discharges from all Stormwater Outfalls.  Styropek shall also produce, on request, any underlying documents considered in developing the Stormwater Management Plan.  The Stormwater Management Plan shall include: (i) proposed interim deadlines for each phase of the project; and (ii) implementation deadlines for measures that can be implemented prior to completion of the entire project.  The Stormwater Management Plan shall also include an application to modify the Permit to allow the installation of treated wastewater sampling mechanisms at active Stormwater Outfalls, pursuant to Paragraph 24.  Plaintiffs shall have thirty

days to review the report and request additional information.  Following the thirty-day review period, Plaintiffs shall submit comments to the Department.  The Department shall confer with the Parties, and the Department shall approve or disapprove and request modification of the Stormwater Management Plan.  If the Stormwater Management Plan is disapproved, Styropek shall submit for the Department's approval a revised Stormwater Management Plan fully addressing the Department's comments set forth in its disapproval.  Upon the Department's approval of the Stormwater Management Plan, Styropek shall implement the approved Stormwater Management Plan.

        d.    **Implementation**:  Not later than three years after the effective date of this Consent Decree, Styropek shall complete and fully implement all elements of the Department-approved Stormwater Management Plan, subject to the Department having issued all permits required for implementation to have occurred.  Until its completion, Styropek shall provide Plaintiffs and the Department with quarterly written updates regarding its progress in implementing the Stormwater Management Plan.  Documentation and results of the review or testing of implemented improvements shall also be provided to Plaintiffs and the Department.

      19.    <u>Stormwater Compliance</u>:  Styropek shall achieve and maintain a condition of no Unauthorized Discharges from all Stormwater Outfalls not later than three years from the effective date of this Consent Decree.  In addition, if Styropek determines pursuant to Paragraph 17 that existing compliance measures are sufficient to achieve compliance at Outfalls 001, 021, and/or 025, Styropek shall achieve and maintain a condition of no Unauthorized Discharges from each such outfall not later than one year from the effective date of this Consent Decree.

      20.    <u>Tolling During Construction</u>:  To the extent construction during implementation of the Department-approved Wastewater Plan or Department-approved Stormwater Management

Plan interferes with an outfall at which Styropek is otherwise required to maintain compliance pursuant to Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls), stipulated penalties otherwise attributable to noncompliance at the impacted outfall shall not be imposed while the interfering construction is ongoing. Styropek shall take all reasonable measures to minimize the impact of construction on compliance.

MONITORING REQUIREMENTS

21.     Whether an Unauthorized Discharge has occurred at the Facility will be determined through the following means: Styropek's collection and analysis of data and samples generated by the outfall monitoring devices installed for monitoring Plastic Solids; and the Department's consideration and inspection of evidence of alleged discharges of Plastic Solids, including evidence submitted through citizen reports or complaints.

22.     Outfall Monitoring:

a.     Prior to the onset of the compliance deadline under Paragraph 15 (Outfall 002), Styropek shall install and operate an end-of-pipe monitoring device at Outfall 002 that allows for monitoring of the treated wastewater sufficient to detect the presence of Plastic Solids in wastewater discharged from that outfall. The monitoring device shall include a wastewater sampling mechanism ("WSM") that allows for the continuous collection of the associated wastewater, after treatment but prior to discharge through the outfall, to monitor for the presence of Plastic Solids. The WSM(s) must be designed with a filter mesh size small enough to capture all Plastic Solids.

b.     Prior to the onset of the compliance deadline under Paragraph 19 (Stormwater Outfalls), as part of the Stormwater Management Plan required under Paragraph 18, Styropek shall provide Plaintiffs and the Department with a written report that includes: (i) an

evaluation of stormwater sampling mechanisms ("SSMs") appropriate for use at each Stormwater Outfall that allows for the continuous collection of stormwater, during periods of stormwater discharge, to monitor for the presence of Plastic Solids; and (ii) a proposed plan for the installation and operation of SSMs sufficient to detect the presence of Plastic Solids in stormwater during periods of discharge from each Stormwater Outfall.  Any such monitoring mechanism(s) appropriate for use at each Stormwater Outfall will be addressed by, and implemented in accordance with, the Stormwater Management Plan approved by the Department.

c.    Prior to the onset of any compliance deadlines under Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls), Styropek shall provide Plaintiffs and the Department with a written report that includes: (i) a description of the inspection, maintenance, and monitoring training programs developed for the WSM(s) and SSM(s), and copies of associated instruction materials; and (ii) a description of the practices and procedures it has developed to ensure that each WSM and SSM is maintained in proper condition to perform the function for which they were designed, and a certification that it will continue to follow those practices and procedures.

23.    Outfall Monitoring - Inspection of Monitoring Mechanisms: Styropek shall inspect each WSM at least once per week and each SSM within one week of a Rain Event. Styropek shall record the dates on which any Plastic Solids are detected and the amounts of Plastic Solids collected pursuant to each inspection.  Styropek shall make a written record of information gathered from each WSM and SSM, including photographs of any Plastic Solids collected.  Plaintiffs and the Department shall have access to the monitoring data generated by, and any documentation of Plastic Solids collected by, the WSM and SSM installed at each

outfall.  Styropek shall allow the Department to physically inspect the discharge water and any solids collected by the WSM(s) and SSM(s).

24.    <u>Determination of Unauthorized Discharges by the Department (occurring after the compliance deadlines of this Consent Decree)</u>: Plaintiffs or other concerned citizens may submit documentation of Plastic Solids found in the water column outside of Defendants' outfalls in Raccoon Creek and the Ohio River, found on the shores of Raccoon Creek and the Ohio River, or found in the area surrounding the Facility, to the Department for review of an alleged Unauthorized Discharge occurring after the compliance deadlines in Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls) of this Consent Decree.  Submissions shall be made by electronic mail to the representative of the Department identified in Paragraph 46 (Notices), with copies to representatives for Plaintiffs and Styropek.  The Department may also unilaterally initiate its own investigations of Unauthorized Discharges.  The Department shall have reasonable access to the Facility and Styropek personnel as necessary to determine whether documentation demonstrates current discharges by Styropek of Plastic Solids that have not already been identified by WSMs and SSMs or other self-reporting by Styropek (such as a report of a spill). Styropek shall have the opportunity to submit to the Department information about the alleged Unauthorized Discharge including its origin, copies of which shall be provided to Plaintiffs. Final determinations as to whether such third-party reports or Department inspections are sufficient to establish an Unauthorized Discharge occurring after the effective date of this Consent Decree will be made by the Department, although Styropek shall have fourteen (14) working days from Styropek's receipt of a final determination by the Department to present evidence that the determination is incorrect, which the Department shall review in good faith and thereafter confirm or modify its determination.  For purposes of Paragraph 34 (Stipulated Payments) and

Paragraph 59 (Termination), such Unauthorized Discharge violations will be attributable to the month in which the Unauthorized Discharge occurred.

25.    <u>Monthly Monitoring Reports</u>: Styropek shall produce monthly written reports of outfall monitoring results with respect to each WSM and SSM at the Facility, broken down by each inspection event under Paragraph 23 and identifying each Unauthorized Discharge documented by WSM and SSM data.  The reports shall also identify any alleged discharges of Plastic Solids submitted through citizen reports or otherwise investigated by the Department and shall identify as a potential Unauthorized Discharge each discharge of Plastic Solids determined, based on available information, to be a new discharge pursuant to Paragraph 24.  Styropek shall produce monthly written reports to the Plaintiffs by electronic mail to the representative of the Plaintiffs identified in Paragraph 46 (Notices) and to the Department with eDMRs not later than 30 days after the end of each month.

REMEDIATION OF PAST DISCHARGES

26.    Styropek shall investigate the potential for remediation of Raccoon Creek and oversee remediation efforts.  It shall retain qualified outside personnel to review potential remediation methods with the goal of removing Plastic Solids from Raccoon Creek.

27.    <u>Surface Water Evaluation</u>:  In January 2025, Styropek independently initiated a Surface Water Evaluation that includes a fate and transport analysis of plastic beads along surface water pathways, identification of depositional areas (including during high water events) along Raccoon Creek and the Ohio River proximate to the Facility, and an analysis of identified plastic beads and bead re-entrainment potential.  Styropek shall provide the Surface Water Evaluation to the Department and Plaintiffs upon its completion, but in no event later than the end of the first quarter of 2027.

28.    <u>Remediation Analysis and Plan</u>:  Not later than six months after receiving the Surface Water Evaluation, Styropek shall provide the Department and Plaintiffs with a Remediation Analysis and Plan that summarizes its findings.  The Remediation Analysis and Plan shall evaluate: (i) risks created by disturbing any historical pollution present in and around Raccoon Creek and the creek bed; (ii) the potential impact of remediation work on aquatic life, vegetation, the waterbodies' designated uses, and navigation; (iii) the technical feasibility and costs of potential Plastic Solids removal methods; (iv) the dispersal or dissipation of volumes and concentrations of Plastic Solids from Raccoon Creek and the creek bed; and (v) any other relevant considerations.  If the Remediation Analysis and Plan identifies a technically feasible and cost-effective remediation method to remove Plastic Solids from Raccoon Creek and the creek bed, and indicates that the benefits of remediation to the environment and/or public health are likely to outweigh potential environmental, social and economic harms, Styropek shall include in the Remediation and Analysis Plan detailed recommendations for the removal of Plastic Solids from Raccoon Creek and provide a list of necessary permits and a proposed schedule for implementation.  The Plaintiffs shall have thirty days to provide comments to Styropek and the Department on the Remediation Analysis and Plan and, if requested, the Plaintiffs and their expert(s) shall have an opportunity within this time period (or a longer time period if approved in writing by the Department) to consult with Styropek to resolve any questions or concerns.

29.    No component of the Remediation Analysis and Plan may proceed without explicit authorization from the Department, including, but not limited to, obtaining any necessary permits.  If the Department requests that the Remediation Analysis and Plan be modified and resubmitted, Styropek shall, within sixty (60) days of notification, resubmit the Remediation

Analysis and Plan to fully address the Department's comments.  If the Department objects to the proposed recommendations for remediation or otherwise fails to approve the Remediation Analysis and Plan within six months of receiving the proposed recommendations (or resubmitted recommendations, if requested by the Department), all obligations to remediate pursuant to this Consent Decree shall be discharged.  Neither Styropek nor Plaintiffs shall seek a reversal of or otherwise appeal the Department's actions under this paragraph.

30.     Upon approval from the Department, Styropek shall oversee the remediation of Raccoon Creek in accordance with the Remediation Analysis and Plan approved by the Department until: (i) the project is completed; (ii) the Department requests that efforts cease for any reason, including based on a recommendation by Styropek that further remediation efforts will harm Raccoon Creek or the surrounding watershed, or are otherwise unnecessary; or (iii) the Remediation Fund established in Paragraph 41(b) is exhausted.  Styropek shall produce quarterly updates to the Parties while implementing its remediation recommendations.

31.     Within sixty days of the conclusion of remediation efforts pursuant to Paragraph 30, Styropek shall produce to the Department and Plaintiffs a final report that includes a summary of remediation efforts, including its best approximation of the total amount of Plastic Solids removed and such other findings that it believes will contribute to a fuller understanding of the Raccoon Creek ecosystem.

<u>PERMIT TERMS</u>

32.     Not later than six months after certification of the Compliance Measures required pursuant to Paragraphs 12 and 17, Styropek shall submit to the Department an application to modify the appropriate permit(s) to incorporate each such Compliance Measures.

STIPULATED PAYMENTS

33.     Beginning with the compliance dates set forth in Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls), and subject to Paragraphs 49 through 51 (Force Majeure): if the monitoring reports generated pursuant to Paragraph 25 reveal an Unauthorized Discharge(s), Styropek shall pay, separately for each outfall where an unauthorized discharge occurred, a stipulated payment as set forth in Paragraph 34.  For example, Unauthorized Discharges from two different outfalls occurring on the same day would require two stipulated payments. Separately with respect to each outfall (Outfall 002 and each individual Stormwater Outfall), Styropek shall be obligated to pay stipulated payments for Unauthorized Discharges pursuant to this paragraph until ten consecutive calendar months of compliance is achieved for each outfall, defined as no Unauthorized Discharges in at least 90% of inspection events under Paragraph 23 (weekly for Outfall 002, within one week of Rain Events for Stormwater Outfalls) during the ten consecutive calendar months.

34.     Stipulated payments for each Unauthorized Discharge shall be determined with respect to each outfall, to be paid in the following amounts based upon:

        a.      **Outfall Monitoring (pursuant to paragraph 22)**:  For each inspection of a monitoring mechanism conducted pursuant to Paragraph 23 that detects Plastic Solids, Styropek shall pay a stipulated payment, as follows:

                i.      Outfall 002 (via WSM): During the first year of monitoring following the compliance date set forth in Paragraph 15 (Outfall 002), the amount of each payment shall be $2,000.  Beginning one year following the compliance date and continuing until compliance is achieved, the amount of each payment shall be $5,000.

      ii.    <u>Stormwater Outfalls (via SSM)</u>: During the first year of monitoring following each compliance date set forth in Paragraph 19 (Stormwater Outfalls), at each Stormwater Outfall at which Plastic Solids are detected, Styropek shall pay $1,500 per inspection event (reduced to $750 for inspection events that detect ten or fewer Plastic Solids).  Beginning one year following each compliance date and continuing until the obligation to pay stipulated payments under paragraph 33 ends, Styropek shall pay $3,500 per inspection event (reduced to $1,750 for inspection events that detect ten or fewer Plastic Solids).

      b.    **Department Inspections**:  For each day after the compliance deadlines under Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls) that the Department documents the presence of Plastic Solids outside of Styropek's outfalls that are attributable to Styropek pursuant to Paragraph 24, and on which separate violations are not detected by Outfall Monitoring under Paragraph 34(a), Styropek shall pay a stipulated payment.  During the first year of monitoring following the compliance dates set forth in Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls), the amount of each such daily payment shall be $500.  Beginning one year following the compliance dates and continuing until compliance is achieved pursuant to Paragraphs 15 and 19, the amount of each daily payment shall be $1,500.

35.    Stipulated payments shall accrue, per day, for each failure by Styropek to complete any of the obligations set forth in Paragraphs 11 – 32 by their applicable deadlines, subject to Paragraphs 49 through 51 (Force Majeure):

| DURATION OF VIOLATION | PENALTY AMOUNT PER DAY |
|---|---|
| 1-30 days | $250 |
| 31-60 days | $1,000 |
| Over 60 days | $2,500 |

36.     Stipulated payments shall be due automatically and without notice.  Stipulated payments shall be payable: (a) within thirty days of Styropek's submission of a Monthly Monitoring Report that identifies an Unauthorized Discharge documented by an Outfall monitor; (b) within thirty days of receipt of a final determination from the Department that an inspection or third-party report established an Unauthorized Discharge pursuant to Paragraph 25; or (c) within fifteen days of Styropek's completion of an obligation at a date later than an applicable deadline, pursuant to Paragraph 35.  Styropek shall notify Plaintiffs and the Department in writing of any payment of a stipulated payment.

        a.     Styropek shall pay fifty percent (50%) of each stipulated payment due directly to the Raccoon Creek Benefit Fund as set forth in Paragraph 41(a);

        b.     Styropek shall pay fifty percent (50%) of each stipulated payment due directly to the Department's Clean Water Fund and submitted to the Department in accordance with Paragraph 47.

37.     Payment of stipulated payments does not preclude the Department and/or Plaintiffs from pursuing enforcement of any of the terms of this Consent Decree by the Court.

<u>REPORTING</u>

38.     <u>Quarterly Progress Reports</u>:  Beginning on October 15, 2025, and continuing every January 15, April 15, July 15, and October 15 thereafter until all compliance and performance measures in Paragraphs 11 – 32 have been evaluated or implemented, Styropek shall provide Plaintiffs and the Department with written, quarterly progress reports that contain the following information:  (i) the date each evaluation and compliance measure set forth in Paragraphs 11 – 32 was completed or implemented, and any completed report(s) required as part of such evaluations and/or compliance measures; and (ii) for any evaluation or compliance

measure not yet completed, a description of the status of such evaluations or compliance measures.

39.    <u>Discharge Monitoring Reports</u>:  When there has been a discharge of Plastic Solid(s) as determined pursuant to Paragraph 25, Styropek shall report each such discharge to the Department as a violation of the Permit on its monthly discharge monitoring reports.  Styropek shall work with the Department as necessary to create a format for reporting such violations. Styropek shall provide a copy of each such discharge monitoring report to Plaintiffs at the same time it is submitted to the Department.

## VI.    CIVIL PENALTY

40.    Within thirty (30) days of the effective date of this Consent Decree, Defendants shall pay to the Pennsylvania Clean Water Fund a civil penalty of One Hundred Thousand Dollars ($100,000.00) in full settlement of any and all violations of the CWA and the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 *et seq*., alleged by Plaintiffs in this action that occurred on or before the filing of the Complaint through the date this Consent Decree is entered.

## VII.    ADDITIONAL PAYMENTS

41.    Defendants shall make an additional payment of Two Million Five Hundred Thousand Dollars ($2,500,000) in settlement of the alleged violations that are the subject of this suit ("Additional Settlement Payment").  Defendants shall make the payment to Foundation for Pennsylvania Watersheds ("FPW"), in accordance with instructions to be provided to Defendants by FPW, within thirty (30) days after the of the effective date of this Consent Decree.

a.    <u>Raccoon Creek Benefit Fund</u>: Five Hundred Thousand Dollars ($500,000) of the Additional Settlement Payment to FPW shall be used to create the Raccoon Creek Benefit Fund ("Benefit Fund").  As a condition of receiving any funds pursuant to Paragraphs 36 and 41

of this Consent Decree, FPW shall agree: (i) to certify that FPW is a 501(c)(3) tax-exempt entity; (ii) to disburse any money from the Benefit Fund solely to fund a project or projects designed to promote the restoration, preservation, protection, remediation of pollutants, or other beneficial impacts on water quality in the Raccoon Creek watershed and areas in the Ohio River watershed proximate to Raccoon Creek; (iii) not to use any money received under this Consent Decree for litigation or political lobbying activities; and (iv) to submit to the Parties on the first anniversary of receiving the payment described in this paragraph, and on each anniversary thereafter, a report describing how the money was spent, and certifying that the funds were used in the manner described in this Consent Decree, until all money is expended.  FPW shall also agree to solicit, review, and fund qualifying proposals from other 501(c)(3) tax-exempt entities.

b.    <u>Raccoon Creek Plastic Remediation Fund</u>: Two Million Dollars ($2,000,000) of the Additional Settlement Payment to FPW shall initially be set aside and used to create the Raccoon Creek Plastic Remediation Fund ("Remediation Fund"), to be used for the sole purpose of funding the remediation project described in Paragraph 30.  If no remediation project is authorized by the Department pursuant to Paragraph 29, FPW shall, within 30 days after notice from the Department that no remediation project is authorized, transfer the funds held for the remediation project to the Benefit Fund and disburse them in accordance with the conditions set forth in Paragraph 41(a).  If the Department authorizes the remediation project, FPW shall arrange for payment to Styropek or its designee from the Remediation Fund to fund the remediation project until remediation work is terminated pursuant to Paragraph 30.  FPW shall pay all invoices submitted by Styropek or its designee within thirty (30) days of receipt of the invoice. At the time remediation work is terminated pursuant to Paragraph 30, any funds

remaining in the Remediation Fund shall be transferred to the Benefit Fund and disbursed in accordance with the conditions set forth in Paragraph 41(a).

   c. The reasonable cost of administering the Benefit Fund and Remediation Fund, including costs of the Trustee, shall be paid to FPW out of each Fund.

   d. All unspent funds remaining in the Benefit Fund five years after the final payment to the Benefit Fund shall be transferred to the Pennsylvania Clean Water Fund. However, if any portion of the Benefit Fund has been committed to a project or projects before the deadline for transfer to the Pennsylvania Clean Water Fund, FPW may retain and distribute that portion of the Benefit Fund.

  42. Payments made under Paragraphs 34, 35, 40, 41, and 43 of this Consent Decree shall not be tax deductible by Defendants.  Any public statement made by Defendants in any press release, in any oral or written material promoting Defendants' environmental or charitable practices or record, or in Defendants' Annual Reports, that makes reference to Defendants' payments to the organization described in Paragraph 41 shall include the following language: "Payments to Foundation for Pennsylvania Watersheds were made pursuant to the settlement of alleged violations of the Clean Water Act in an enforcement suit brought by PennEnvironment and Three Rivers Waterkeeper."

## VIII. COSTS OF LITIGATION

  43. Consistent with 33 U.S.C. § 1365(d), within thirty (30) days of the Court's entry of this Consent Decree, Defendants shall pay the amount of $375,000 in full and complete satisfaction of Defendants' obligation to reimburse the Plaintiffs' reasonable costs of litigation in this action (including reasonable attorney and expert witness fees) to Plaintiffs' counsel by company check or wire transfer payable to the National Environmental Law Center; provided,

that in any legal action by Plaintiffs to enforce this Consent Decree in which Plaintiffs ultimately

prevail or substantially prevail, the Court, in issuing any final order, may award costs of

litigation for such prevailing claims (including reasonable attorney and expert witness fees) in

the manner provided for in 33 U.S.C. § 1365(d). As to the Department, Styropek and the

Department shall bear their respective attorney fees, expenses and other costs in the prosecution

or defense of this matter or any related matters, arising prior to the execution of this Consent

Decree.

## IX.    ENFORCEMENT

44.    The Court shall retain jurisdiction of this case until the termination of the Consent

Decree to enforce the terms and conditions of the Consent Decree, to modify the Consent

Decree, and to resolve disputes arising hereunder; provided, however, that the Court shall not

exercise jurisdiction over any dispute regarding, or appeal of, or compliance with, an NPDES

Permit to Defendants or the appeal of, or compliance with,  other permits required under or

referenced in this Consent Decree.  Any appeal by any party of any final issuance of an NPDES

Permit or other permits to Defendants shall be filed with the Pennsylvania Environmental

Hearing Board in accordance with Pennsylvania law.  In the event Defendants fail to comply

with any provision of this Consent Decree, the Plaintiffs and/or the Department may seek to

enforce this Consent Decree by motion in this case.  Nothing in this Consent Decree is intended

to limit or preclude the Department in any way from exercising its authority to enforce the

provisions of the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 *et seq*., and the regulations

promulgated thereunder.

45.    Reservation of Rights:  The Department reserves all rights against Defendants to

require additional measures to achieve compliance with applicable law with respect to all matters

not addressed by this Consent Decree.  In addition, the Department reserves all rights to require additional measures with respect to the matters addressed by this Consent Decree that are required to achieve compliance with any changes in applicable law or regulation occurring after the entry of this Consent Decree.  Defendants reserve the right to challenge any action which the Department may take to require those measures.  Provided Defendants comply with Paragraphs 26-31, 41, and 42 of this Consent Decree, the Department will not require additional measures for the remediation of Plastic Solids from Raccoon Creek and the creek bed from discharges occurring prior to the compliance deadlines under Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls).

## X.    GENERAL PROVISIONS

46.    The provisions of this Consent Decree shall be severable, and should any provision hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the Parties.

47.    <u>Notices</u>: Defendants shall not assert any claim of confidentiality for any documents or information provided to Plaintiff pursuant to this Consent Decree.  Notification to a Party shall be deemed submitted on the date it is emailed or postmarked.  All correspondence concerning this Consent Decree and all documents that are submitted pursuant to this Consent Decree shall be addressed as follows:

As to the Plaintiffs:

Matthew Donohue
National Environmental Law Center
294 Washington Street, Suite 720
Boston, MA 02108
Email:  mdononue@nelc.org
Telephone: (617) 747-4304

As to the Department:

Paul Armagost
Compliance Specialist, Clean Water Program
PA Department of Environmental Protection
400 Waterfront Drive
Pittsburgh, PA  15222
Email: parmagost@pa.gov
Telephone: (412) 442-4000

As to Defendants:

Danielle Kephart, General Counsel
16945 Northchase Dr., Ste. 1560
Houston, TX  77060
Email: danielle.kephart@styropek.com
Telephone: (724) 770-2425

With a copy to:

Alan S. Miller
Houston Harbaugh P.C.
Three Gateway Center
401 Liberty Avenue, 22nd Floor
Pittsburgh, PA  15219-1005
Email: milleras@hh-law.com
Telephone: (412) 288-4004

48.     No changes, additions, modification, or amendments of this Consent Decree shall be effective unless they are set out in writing and agreed to by all Parties to the Consent Decree and approved by the Court.

49.     The effective date of this Consent Decree shall be the date of its entry.

## XI.     FORCE MAJEURE/DELAY

50.     "Force Majeure" for the purposes of this Consent Decree is defined as an event arising from causes beyond the control of Defendants or the control of any entity controlled by Defendants, including their consultants and contractors, which could not have been foreseen and prevented by the exercise of all reasonable diligence, which delays or prevents the performance or completion of any of the compliance measures by the dates or within the period(s) of time set

forth in Paragraphs 11 - 35. "Force Majeure" does not include financial inability to comply. Force majeure does not apply to any other provision of this Consent Decree.

51.    If any event occurs that causes or may cause delay in the completion of any of the compliance measures by the dates or within the period(s) of time set forth in Paragraphs 11 - 35, Defendants shall notify Plaintiffs within ten (10) working days of the date on which Defendants became aware of the potential delay. Upon notification, Plaintiffs shall have the right to request all necessary documentation explaining the potential delay. If requested, Defendants shall have ten (10) working days from the date of the request to provide the documentation. If Defendants request an extension of the deadlines specified in Paragraphs 11 – 35, Plaintiffs shall have the right to grant all or part of the extension requested. If the Parties cannot reach agreement, Defendants shall have the right to apply to the Court for an extension of time, but shall have the burden of proving to the Court that refusal by Plaintiffs to grant the requested extension was unreasonable based on the information then available to Plaintiffs. In no event will Defendants be required to pay stipulated payments during the time between the date which Plaintiffs receive such a request from Defendants and the date which a final decision is issued regarding such request. If the final decision denies Defendants' request for an extension, Defendants shall pay all stipulated payments that were deferred during the pendency of the request.

52.    <u>Impact of Force Majeure on Termination</u>: for purposes of terminating stipulated payments (pursuant to Paragraph 33) and terminating the Consent Decree (pursuant to Paragraph 59), the days to which a Force Majeure event applies under Paragraphs 50 and 51 shall be excluded from the relevant calendar month. For example, if a five-day Force Majeure event occurs in a calendar month that follows five consecutive calendar months of no Unauthorized

Discharge at an outfall, those five consecutive calendar months carry forward, and the five days

to which Force Majeure applies shall be excluded from analysis of the sixth calendar month.

## XII.    DISPUTE RESOLUTION

53.    Unless otherwise expressly provided for in this Consent Decree, the Dispute

Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes

regarding this Consent Decree.

54.    <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under

this Consent Decree shall first be the subject of informal negotiations. The dispute shall be

considered to have arisen when the aggrieved Party or Parties sends the other Parties a written

Notice of Dispute. Such Notice of Dispute shall clearly state the contested matter. The period of

informal negotiations shall not exceed 30 days from the date the dispute arises, unless that period

is modified by written agreement by all Parties. If the Parties cannot resolve a dispute by

informal negotiations, then the position advanced by the Department shall be considered binding

unless, within 30 days after the conclusion of the informal negotiation period, one or more of the

remaining Parties invokes the Judicial Dispute Resolution procedures, as set forth below.  The

Department will consult with Plaintiffs in connection with advancing its position, but the

Department shall have final decision-making authority.

55.    <u>Judicial Dispute Resolution</u>.  Any Party may seek judicial review of the dispute

by filing with the Court and serving on the remaining Parties a motion requesting judicial

resolution of the dispute. The motion must be filed within 30 days after the conclusion of the

informal dispute resolution period. The motion shall contain a written statement of the aggrieved

Party's position on the matter in dispute, including any supporting factual data, analysis, opinion,

documentation, or affidavit; set forth the relief requested; and include a proposed case

management order setting forth any applicable deadlines, as appropriate, necessary to promptly resolve the dispute and ensure orderly implementation of the Consent Decree.

56.     The remaining Parties shall file a written response to the motion within 30 days of receipt of the filed motion. The aggrieved Party may file a reply memorandum within 15 days of receipt of the filed response.

57.     Any of the deadlines set forth in this Section may be modified by agreement of the Parties or leave of Court.

58.     The invocation of dispute resolution procedures shall not, by itself, extend, postpone, or affect in any way any obligation under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, with payment placed in escrow pending resolution of the dispute.  If Styropek does not prevail on the disputed issue, stipulated penalties shall be released from escrow and paid to the Raccoon Creek Benefit Fund and Clean Water Fund pursuant to Paragraph 36.  Styropek shall pay any additional accrued stipulated penalties to within 30 days of the date the dispute is resolved.

## XIII.    TERMINATION, RESOLUTION OF CLAIMS, AND MISCELLANEOUS PROVISIONS

59.     This Consent Decree shall expire once Styropek has completed the compliance measures and obligations set forth in Paragraphs 11 - 32, has demonstrated no Unauthorized Discharges from each outfall in at least 90% of inspection events under Paragraph 23 (weekly for Outfall 002, within one week of Rain Events for Stormwater Outfalls) for ten consecutive calendar months following the compliance dates imposed by Paragraphs 15 (Outfall 002) and 19 (Stormwater Outfalls), and has paid all penalties due under this Consent Decree.  For clarity, once Styropek has demonstrated no Unauthorized Discharge in at least 90% of inspection events

for ten consecutive calendar months at a particular outfall, the conditions for this Consent Decree to expire as to that outfall are satisfied. If the ratio of Unauthorized Discharges to inspection events results in a percentage that is expressed with a decimal, the percentage shall be rounded up to the nearest whole percentage point (e.g., 84.31% is rounded up to 85%).

60.     This Consent Decree constitutes a settlement of all claims for civil penalties and injunctive relief pursuant to the CWA and the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 *et seq.*, the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.101 *et seq.*, and any other Pennsylvania law potentially applicable for the violations alleged in the Complaint.

61.     This Consent Decree sets forth all of the obligations of the Parties and represents the complete and exclusive statement of the Parties with respect to the terms of the settlement agreement embodied by this Consent Decree; any other representations, communications, or agreements by or between the Parties shall have no effect.

62.     The Parties shall file a notice with the Court certifying that the requirements of Paragraph 59 have been fulfilled and, as a result, the Consent Decree is terminated.

### XIV.    CONSENT TO ENTRY OF CONSENT DECREE

63.     Each of the Parties consents to the entry of this Consent Decree, subject to the Court's approval of this Consent Decree. The undersigned representatives of each Party certify that they are fully authorized by the Party to enter into the terms and conditions of this Consent Decree and to execute and legally bind the represented Parties to it. This Consent Decree can be signed in counterparts.

Judgment is hereby entered in accordance with this Consent Decree and Order this _____ day of

_____, 2025.

_____

United States District Judge

AGREED AND CONSENTED TO:


FOR PLAINTIFF PENNENVIRONMENT, INC.:


_____          Date: ___9/3/25___
David Masur
Executive Director

FOR PLAINTIFF THREE RIVERS WATERKEEPER:


_____          Date: _____
Heather Hulton Van Tassel
Executive Director

FOR PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION:


_____          Date: _____
Name
Title

FOR DEFENDANTS BVPV etc.:


_____          Date: _____
Andreas Plettner
President


_____          Date: _____
Danielle Kephart
General Counsel

AGREED AND CONSENTED TO:


FOR PLAINTIFF PENNENVIRONMENT, INC.:


_____      Date: _____
David Masur
Executive Director


FOR PLAINTIFF THREE RIVERS WATERKEEPER:


_____      Date: 9/2/20 25
Heather Hulton Van Tassel
Executive Director


FOR PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION:


_____      Date: _____
Name
Title


FOR DEFENDANTS BVPV etc.:


_____      Date: _____
Andreas Plettner
President


_____      Date: _____
Danielle Kephart
General Counsel

AGREED AND CONSENTED TO:


FOR PLAINTIFF PENNENVIRONMENT, INC.:


_____    Date: _____
David Masur
Executive Director


FOR PLAINTIFF THREE RIVERS WATERKEEPER:


_____    Date: _____
Heather Hulton Van Tassel
Executive Director


FOR PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION:


*Christopher J Kriley*
_____    Date: 8/19/25
Name Christopher J. Kriley P.E.
Title   Program Manager
          Clean Water Program


FOR DEFENDANTS BVPV etc.:


_____    Date: _____
Andreas Plettner
President


_____    Date: _____
Danielle Kephart
General Counsel


35

AGREED AND CONSENTED TO:

FOR PLAINTIFF PENNENVIRONMENT, INC.:

_____          Date: _____
David Masur
Executive Director

FOR PLAINTIFF THREE RIVERS WATERKEEPER:

_____          Date: _____
Heather Hulton Van Tassel
Executive Director

FOR PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION:

_____          Date: _____
Name
Title

FOR DEFENDANTS BVPV etc.:

_____          Date: __Aug 22, 2025__
Andreas Plettner
President

_____          Date: __Aug. 25, 2025__
Danielle Kephart
General Counsel

# **<u>Appendix A</u>**

## MEMORANDUM OF UNDERSTANDING
## RACCOON CREEK BENEFIT FUND

    This Memorandum of Understanding ("Memorandum") is made by and between BVPV STYRENICS LLC and STYROPEK USA, INC. (collectively, "Styropek") and THE FOUNDATION FOR PENNSYLVANIA WATERSHEDS ("FPW"), a Pennsylvania corporation organized for non-profit purposes.

    1.    <u>Background</u>. Pursuant to a Consent Decree to be entered by the United States District Court for the Western District of Pennsylvania in settlement of litigation between PennEnvironment, Inc. and Three Rivers Waterkeeper and Styropek, Styropek has agreed to make a payment to FPW in the total amount of Two Million Five Hundred Thousand Dollars ($2,500,000) in accordance with Section VII of the Consent Decree (referred to therein and here as "Additional Settlement Payment"), which funds shall be used by FPW exclusively for the purposes and on the terms stipulated in Section VII of the Consent Decree and herein. Any stipulated penalties subsequently paid by Styropek to FPW pursuant to paragraph 36 of the Consent Decree shall likewise be used exclusively for the purposes and on the terms stipulated in the Consent Decree and herein.

    2.    <u>Agreement to Pay</u>. In accordance Section VII of the Consent Decree. Styropek agreed to make the Additional Settlement Payment to FPW within thirty (30) days after the effective date of the Consent Decree in accordance with written instructions to be provided by FWP.

    3.    <u>Creation and Use of Funds</u>. The Additional Settlement Payment made by Styropek under Section VII of the Consent Decree shall be used to create two separate, restricted Funds. Any distributions may be made from the principal and income of the Funds.

    (a)    *Raccoon Creek Benefit Fund*: Five Hundred Thousand Dollars ($500,000) of the Additional Settlement Payment shall be used to create the Raccoon Creek Benefit Fund ("Benefit Fund"), from which FPW will distribute funds solely to fund a project or projects designed to promote the restoration, preservation, protection, or other beneficial impacts on water quality in the Raccoon Creek watershed and areas in the Ohio River watershed proximate to Raccoon Creek. FPW shall attempt to maximize the impact of the Benefit Fund by making distributions to projects eligible for other sources of matching funds, to the extent practicable.

    Any stipulated penalties paid by Styropek pursuant to Paragraph 36 of the Consent Decree shall be added to the Benefit Fund.

    (b)    *Raccoon Creek Plastic Remediation Fund*: Two Million Dollars ($2,000,000) of the Additional Settlement Payment shall be used to create the Raccoon Creek Plastic Remediation Fund ("Remediation Fund"), to be used for the sole purpose of funding the remediation project described in Paragraph 30 of the Consent Decree.

    If no remediation project is authorized pursuant to Paragraph 29 of the Consent Decree, then FPW shall transfer all funds in the Remediation Fund to the Benefit Fund.

1

If a remediation project is authorized, FPW shall arrange for periodic payments to Styropek or its designee from the Remediation Fund to fund the remediation project until remediation work is terminated pursuant to Paragraph 30 of the Consent Decree. At that time, any funds remaining in the Remediation Fund shall be transferred to the Benefit Fund. FPW's obligation is to arrange for timely payments as requested, and it is not responsible for ensuring that invoiced work meets the specifications of the remediation project described in Paragraph 30.

4.    Condition on Funds.  As a condition of receiving payments to establish the Funds, FPW agrees:

(a)    To certify that FPW is a 501(c)(3) tax-exempt entity;

(b)    Not to distribute the Funds for any purpose other than the purposes set forth in Paragraph 3, above, and Section VII of the Consent Decree;

(c)    Not to use any money received under the Consent Decree for litigation or political lobbying activities.

5.    Selection of Projects.

(a)    FPW shall take all necessary steps to identify projects appropriate for the Benefit Fund (as set forth in Paragraph 3, above, and Section VII of the Consent Decree), including, without limitation, soliciting grant applications. FPW agrees to solicit, review, and fund qualifying proposals from other 501(c)(3) tax-exempt entities. Styropek, PennEnvironment, and Three Rivers Waterkeeper may recommend projects to FPW; however, FPW shall have no obligation to fund any particular projects those entities recommend.

(b)    FPW shall have the ultimate decision-making authority over the selection of projects to be funded from the Benefit Fund.

(c)    Upon selecting a project for funding, FPW shall provide written notice to Styropek, PennEnvironment, and Three Rivers Waterkeeper of the selection, along with a written summary of the project, no fewer than fifteen (15) business days in advance of the planned distribution of funds.  During the 15 business days following the receipt of such notice and summary, Styropek, PennEnvironment, and Three Rivers Waterkeeper shall have the opportunity to submit to FPW their comments regarding the selected project(s) and organization(s) conducting the selected project(s).

6.    Timing of Benefit Fund Distributions.  It is the intent of Styropek that distributions from the Benefit Fund will commence as soon as reasonably possible following the creation of the Fund pursuant to Paragraph 3 above, and that the Benefit Fund will be distributed in full by the time five (5) years have elapsed following the final payment or transfer to the Benefit Fund.  All unspent funds in the Benefit Fund five years after the final payment to the Benefit Fund shall be transferred to the Pennsylvania Clean Streams Fund. However, if any portion of the Benefit Fund

has been committed to a project or projects before the deadline for transfer to the Pennsylvania Clean Streams Fund, FPW may retain and distribute that portion of the Benefit Fund.

7.    <u>Administration of Funds</u>.

(a)    The Funds shall be separate funds of restricted charitable assets which shall be separately accounted for; however, assets of the Funds may be commingled for investment purposes.

(b)    FPW shall provide Styropek, PennEnvironment, Three Rivers Waterkeeper, and Pennsylvania Department of Environmental Protection such information relating to the Funds as those parties may reasonably request from time to time.  FPW shall simultaneously provide any such information to Styropek, PennEnvironment, Three Rivers Waterkeeper, and Pennsylvania Department of Environmental Protection, regardless of which party initiated the request.

(c)    FPW shall provide Styropek, PennEnvironment, Three Rivers Waterkeeper, and Pennsylvania Department of Environmental Protection with an annual report describing how the Funds were distributed and certifying that the Funds were used for the purposes set forth in Paragraph 3, above, and Section VII of the Consent Decree.  The first annual report shall be provided on the first anniversary of FPW's receipt of the Additional Settlement Payment from Styropek, and on each anniversary thereafter, until the Funds have been distributed in full.  The annual reports shall be mailed or emailed to the representatives identified in Paragraph 47 of the Consent Decree, or to such other representatives as the recipients shall specify by written notice to FPW.

(d)    No distribution shall be made from the Benefit Fund to satisfy any pledge, legal obligation, or other commitment of Styropek or any person with the right to advise FPW.  No distribution shall be made from the Benefit Fund to PennEnvironment or Three Rivers Waterkeeper.

(e)    FPW may charge and retain an administrative fee of no greater than 5.00% from each of the following payments, upon their deposit to the Benefit Fund: (i) the initial Five Hundred Thousand Dollars ($500,000) from the Additional Settlement Payment used for the creation of the Benefit Fund; and (ii) any stipulated payments paid by Styropek pursuant to Paragraph 36 of the Consent Decree.  FPW may also charge and retain an administrative fee of no greater than 2.00% from the initial Two Million Dollars ($2,000,000) from the Additional Settlement Payment used for creation of the Remediation Fund.  If any funds are subsequently transferred from the Remediation Fund to the Benefit Fund pursuant to Paragraph 41(b) of the Consent Decree, FPW may charge an additional administrative fee of no greater than 3.00% from the transferred funds.  No additional fees or expenses may be charged to the Funds for any reason. Any increase in the value of the Funds due to (i) interest, dividends or other income earned by the investment of the assets the Funds or (ii) the capital appreciation of the underlying investments held by the Funds shall not be subject to any administrative fees at any time.

(f)    It is intended that the Funds be a component part of FPW and not a separate trust, and that nothing in this Memorandum shall (i) affect the status of FPW as an organization

3

described in Section 501(c)(3) of the Code (as used herein, the "Code" shall mean the Internal Revenue Code of 1986, as amended, and shall include corresponding provisions of future law) and as an organization which is not a private foundation within the meaning of 509(a) of the Code, or (ii) cause FPW to become liable for the tax imposed by Section 4966 of the Code. This Memorandum shall be interpreted to conform to the requirements of the foregoing provisions of the federal tax laws and any regulations issued pursuant thereto. FPW is authorized to amend this Memorandum to conform to the provisions of any such applicable law or government regulation in order to carry out the purposes of the funds.

8.    <u>Notices</u>. All notices required or permitted to be served hereunder shall be in writing and delivered by email and separately by certified or registered mail, return receipt requested, addressed to the recipients at the addresses specified in Paragraph 47 of the Consent Decree or to such other address as a recipient shall specify. Email shall be sent with the Delivery Receipt and Read Receipt Requested features turned on. All notices shall be deemed given on the date sent.

9.    <u>Binding Effect</u>. All terms, covenants, conditions, and agreements contained in this Memorandum shall extend to and be binding upon the parties hereto and their respective successors and assigns. In the event of insolvency, dissolution, or merger of FPW, this Memorandum shall be assigned to an organization described in Section 501(c)(3) of the Code that has been mutually agreed upon by Styropek, PennEnvironment, and Three Rivers Waterkeeper to complete the distribution of funds in accordance with the provisions of this Memorandum.

10.    <u>Third Party Beneficiary</u>. Excluding only the obligations expressly set forth herein, nothing in this Memorandum is intended to confer any rights, benefits, remedies, obligations or liabilities on any person other than the parties or their respective successors or permitted assigns.

11.    <u>Partial Invalidity</u>. If any term, covenant or condition of this Memorandum shall be invalid or unenforceable, the remainder of this Memorandum shall not be affected thereby, and each term, covenant and condition of this Memorandum shall be valid and shall be enforced to the extent permitted by law.

12.    <u>Governing Law</u>. This Memorandum shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania, without regard to conflict of laws principles.

13.    <u>Authority</u>. Each of Styropek and FPW represents and warrants that it has full right, power, and authority to enter into this Memorandum without the consent or approval of any other entity or person and each party makes these representations knowing that the other party will rely thereon. The signatories on behalf of Styropek and FPW further represent and warrant that each has full right, power, and authority to act for and on behalf of the respective Styropek and FPW in entering into this Memorandum.

14.    <u>Styropek Disclaimer</u>: Nothing in this Memorandum imposes any obligations on, or creates any liability for, Styropek other than to make the payments specified in Section VII of the Consent Decree.

15.     <u>Entire Agreement; Amendment</u>.  This Memorandum embodies the entire agreement arid understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings between the parties hereto with respect to the subject matter hereof. This Memorandum may be amended in a writing signed by the parties or may be amended by FPW in accordance with Paragraph 7(f); provided, however, that no amendment shall change the purpose of the Funds or deprive FPW of ultimate control and absolute discretion over the Benefit Fund.

16.     <u>Counterparts</u>.  This Memorandum may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**[Signature page follows]**

AGREED AND CONSENTED TO:

FOR BVPV STYRENICS LLC and STYROPEK USA, INC.

_____        Date: 9/3/25

Name: Danielle Kephart
Title:   General Counsel

FOUNDATION FOR PENNSYLVANIA WATERSHEDS

_____        Date: _____

Name: Deborah Nardone
Title:   Executive Director

6

AGREED AND CONSENTED TO:

FOR BVPV STYRENICS LLC and STYROPEK USA, INC.

_____          Date: _____

Name: Danielle Kephart
Title:   General Counsel

FOUNDATION FOR PENNSYLVANIA WATERSHEDS

*Deborah Nardone*          Date: 8/12/2025

Name: Deborah Nardone
Title:   Executive Director

6